U.S. v. Kattar                    CV-95-221-JD  08/19/99  P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.                                    Civ. No. 95-221-JD

<u>George T. Kattar, et al.</u>

O R D E R

The United States of America ("government"), brought this action against George T. Kattar, Phyllis Kattar, Personally and as Trustee, Mary Abdoo, Trustee, George P. Kattar, Trustee, Kevin Kattar, Trustee, the Seven Children Trust, and the Town of Meredith, seeking to reduce to judgment certain assessments of tax liabilities made by the Internal Revenue Service ("IRS"), to have a tax lien declared against certain property, and to render void certain fraudulent transfers of property.  Before the court is the motion of the government for summary judgment (document no. 90).

<u>Background</u>[1]

I    <u>Tax Proceedings</u>

On January 16, 1969, Special Agent McNally and Revenue Agent Chernosky contacted George T. Kattar and informed him he was to be investigated for income tax liability based upon allegations of fraud.  The investigation initially focused upon tax years 1962 through 1967 and included review of a number of George T. Kattar's business enterprises, and his income and deductions therefrom.  On November 11, 1971, George T. Kattar was informed by IRS agents that it was likely they would recommend prosecution for willful tax evasion.  The record indicates that prosecution was indeed recommended in the late winter or early spring of 1972.  On April 13, 1972, George T. Kattar was indicted by a federal grand jury for the District of Massachusetts on six counts of tax evasion, charging among other things personal income tax evasion for the years 1965, 1966, 1967, and 1968.  On December 10, 1973, George T. Kattar plead guilty to two counts of subscribing to federal income tax returns which he did not believe to be correct.

After completion of the criminal proceedings, George T. and Phyllis Kattar (alternately the "Kattars") litigated their civil tax liabilities for 1963 through 1967, and 1970, in the United States Tax Court.[2]  <u>See</u> <u>George T. Kattar and Phyllis Kattar v.</u>

---

[1]The following does not constitute findings of fact of the court and is provided for context purposes only.

[2]The record indicates that George T. and Phyllis Kattar file joint tax returns.

<u>Commissioner</u>, 48 T.C.M. 629, (filed July 26, 1984). After a trial, the tax court determined that there were tax deficiencies of approximately $170,000 for those years. As a result, on April 29, 1985, and September 26, 1985, the IRS made assessments for tax, penalties, and interest totaling $505,626.68 for the years 1963 through 1967, and on April 29, 1985, the IRS made an assessment of $70,645.41 for the tax year 1970.

The IRS asserts that on April 12, 1985, it also issued a notice of deficiency for 1971, identifying a deficiency of $18,586, along with statutory additions for negligence. <u>See</u> 26 U.S.C.A. 6653(a). The Kattars do not dispute that they never filed a petition in the Tax Court in connection with this notice. Thereafter, on August 23, 1985, the IRS asserts it issued a deficiency assessment for 1971 in the amount of $50,562.04.

## II    <u>Property Transfers</u>

On March 31, 1969, approximately two months after being contacted by Special Agent McNally regarding the investigation for tax evasion, George T. Kattar created seven trusts titled the "Meredith Clifford Trusts" and numbered them one through seven. Each child of George T. Kattar was designated the sole beneficiary of one of the trusts. George T. Kattar then attempted to transfer over to the Meredith Clifford Trusts the value of certain stock which was owned by him, including stock in the Tri-State Development Corp., the Northeast Investment Co., Inc., the Community Investment Corp., North American Enterprises,

Inc., and the Kattar Realty Trust, Inc.  On May 6, 1976, the Kattars belatedly filed a 1969 federal gift tax return indicating that the total value of stock transferred to the trusts was $133,392.00, with the value of the Kattar Realty Trust stock transferred being $0.00.

The trustees of the trusts were the Kattars' attorneys, Jerome Rosen and Henry Hyder, Jr., and George T. Kattar's sister, Mary Abdoo.  Phyllis Kattar was designated the successor trustee. Although Mary Abdoo signed trust documents, she testified at her deposition that she had not heard of the Meredith Clifford Trusts or that she could not recall the trusts.  Similarly, Henry Hyder testified during his deposition that although he was a trustee, he had little recollection of the trusts or of taking any actions as a trustee.  He stated that he was not involved with and had no records concerning the trusts' books, records, distributions, trustee meetings, or the management of trust assets.  Jerome Rosen testified similarly as to his limited involvement with the trusts, although he also testified that trust records and books were maintained by a secretary of George T. Kattar's corporations.

Kevin Kattar, one beneficiary of the Meredith Clifford Trusts, never received any benefit from the trusts.  Another beneficiary, Kimberly Kattar, had never heard of the trusts, while a third beneficiary, Meredith Kattar, was similarly unaware of their existence.

Also in 1969, Phyllis Kattar signed an affidavit stating

4

that she had signed a purchase and sale agreement to sell the Kattars' residence in Methuen Massachusetts to a neighbor by July 30, 1969. However, she testified in this case that she did not recall selling or offering to sell the Methuen residence to her neighbor.

On December 31, 1970, Phyllis Kattar transferred the title to the Kattars' Methuen residence to George T. Kattar's attorney Henry Hyder. The consideration given was less than $100. However, she testified that she was unaware of ever holding title to the Methuen property or of transferring any real property to Hyder, that a signature on what apparently was the deed was not hers, and that she was unaware until the date of the deposition that title to the property rested in Hyder. Hyder testified that he was holding the property as a nominee for the Kattar family and never used the property. Despite both of the purported transfers, the Kattar family continued to live in and reside at the Methuen property.

On June 20, 1972, two months after George T. Kattar was indicted for tax evasion on joint tax returns for George T. and Phyllis Kattar, they formed the Seven Children Trust ("Trust"). The initial trustees were George T. and Phyllis Kattar, and Mary Abdoo. The current trustees are Phyllis Kattar, Mary Abdoo, and George P. and Kevin Kattar, two of the Kattars' children. The Seven Children Trust was created pursuant to the advice of one of George T. Kattar's attorneys, apparently Henry Hyder, although Hyder could not testify about the reason for the creation of the

5

Trust because of attorney-client privilege. George T. Kattar testified that the Trust was created as an inheritance device. The Trust was structured to issue certificates of interest to beneficiaries of the Trust, denominated shareholders. Pursuant to the terms of the Trust, all property conveyed to the Trust was to vest in the trustees, as joint tenants with right of survivorship as trustees of the Trust, to manage and administer the assets for the benefit of the shareholders. The record indicates that no shares were issued or distributed by the Trust before November 15, 1983, and beneficiaries were not identified until a November 15, 1983, amendment.[3]

Approximately one week after the Seven Children Trust was created, Phyllis Kattar transferred real estate known as "Clovelly," along with the contents of the residence, to George T. Kattar, Phyllis Kattar, and Mary Abdoo as trustees of the Seven Children Trust. The Clovelly residence is a 12 room year-round residence with a recreation building, a boat house, boat slips, and garage. The record indicates that the consideration given for the transfer was less than $100, and was made upon the advice of attorneys as relayed to Phyllis through George T. Kattar.

On June 27, 1972, Hyder transferred his interest in the Methuen property, supposedly conveyed to him earlier by Phyllis Kattar, to the Seven Children Trust for less than $100

---

[3]The record indicates that the Trust was inadvertently created as a real estate trust, and it was subsequently modified.

consideration.  Also on the same day, June 27, 1972, Phyllis Kattar conveyed real property located in Andover, Massachusetts, to the Seven Children Trust, for less than $100 consideration. Phyllis testified that she did not know why she transferred the property to the Seven Children Trust, and George T. Kattar testified that it was his brother's property and that he did not know why the property would have been transferred to the Seven Children Trust.  Indeed, on November 30, 1973, the Seven Children Trust transferred the Andover property to Suzanne M. Kattar, the wife of Peter Kattar, the brother of George T. Kattar.  Peter Kattar never knew that the property had been held by the Seven Children Trust, and Suzanne Kattar testified that she was unaware that she acquired her title to the property from the Seven Children Trust, although they both have generally resided there at least since the late 1960's, Peter Kattar having initially acquired it in 1957.  The record is unclear what consideration was given, although Hyder testified that he was unaware of any consideration being given.

Finally, in 1980 or 1981, after the death of her daughter, Phyllis Kattar transferred her jewelry and furs to the Seven Children Trust.

## Standard

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Snow v.

7

Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the non-movants, "'indulging all reasonable inferences in [their] favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the plaintiff has submitted a properly supported motion for summary judgment, the defendants "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

Fraud must be proven by clear and convincing evidence. See Snow v. American Morgan Horse Assoc. Inc., 141 N.H. 467, 468 (1996) (fraudulent misrepresentation); Chagnon Lumber Co. v. DeMoulder, 121 N.H. 173, 176 (1981) (context of New Hampshire

8

Revised Statutes Annotated ("RSA") ch. 545) (repealed 1987, effective Jan. 1, 1988); <u>Jenney v. Vining</u>, 120 N.H. 377, 381 (1980) (clear and convincing evidence required to show "existence of fraud or actual fraudulent intent") (context of then extant RSA ch. 545); <u>Hoyt v. Horst</u>, 105 N.H. 380, 390 (1964) ("Fraud is never to be presumed, but must be established by clear and convincing proof."); <u>see also</u>, <u>Loyal Cheese Co. v. Wood County Nat'l Bank and Trust Co.</u>, 969 F.2d 515, 518 (7th Cir. 1992) (Wis. Fraudulent Conveyance Act, insolvency provisions); <u>Benson v. Richardson</u>, 537 N.W.2d 748, 758 (Iowa 1995) (Iowa common law); <u>Territorial Sav. & Loan Assoc. v. Baird</u>, 781 P.2d 452, 458 (Utah. Ct. App. 1989) (Utah Fraudulent Conveyance Act) (clear and satisfactory standard context of insolvency provisions); <u>Transamerica Ins. Co. V. Trout</u>, 145 Ariz. 355, 360 (Ariz. Ct. App. 1985) (Arizona Uniform Fraudulent Conveyance Act); <u>Furniture Mfrs. Sales, Inc. v. Deamer</u>, 680 P.2d 398, 399 (Utah 1984); <u>FDIC v. Proia</u>, 663 A.2d 1252, 1254 n.2 (1995) (Maine Uniform Fraudulent Transfer Act) (Act does not change clear and convincing burden of proof). <u>Cf.</u> <u>Warner v. Warner</u>, 65 B.R. 512 (S.D. Ohio 1986) (preponderance of evidence applies to insolvency provisions under Ohio law); <u>United States v. Edwards</u>, 572 F. Supp. 1527, 1534 (D. Conn 1983) (applying preponderance of evidence standard under Conn. law); <u>First Nat'l Bank v. Hoffines</u>, 429 P.A. 109, 114 (1968) (Pennsylvania Uniform Fraudulent Transfer Act) (where grantor is in debt at time of transfer, grantee must prove solvency or fair consideration by

9

clear and convincing evidence).


## Discussion

In this action the government seeks, _inter alia_, to reduce to judgment tax assessments that were made on April 29, 1985, August 23, 1985, and September 26, 1985, against George T. and Phyllis Kattar, for tax years 1963, 1964, 1965, 1966, 1967, 1970, and 1971.  The government further moves to establish tax liens against all the property and rights to property of George T. and Phyllis Kattar.  In order to collect the tax debts, the government seeks to set aside certain transfers of property made by George T. and Phyllis Kattar.  Specifically, the government asks the court to set aside as fraudulent the June 27, 1972, transfer by Phyllis Kattar of real property, together with the contents therein, located on Powers Road, Meredith, New Hampshire ("Clovelly"), to George T. Kattar, Phyllis Kattar and Mary Abdoo as trustees of the Seven Children Trust.  Alternatively, the government argues that because beneficiaries of the Seven Children Trust were not identified until 1983, when the Trust was amended to identify beneficiaries, the transfer to the Seven Children Trust of the real property and its contents took place in 1983, was fraudulent at that time, and should be set aside.[4] Further, the government seeks to render void, as fraudulent, transfers of personal assets made by Phyllis Kattar to the Seven

_____

[4]The government also argues in the alternative that the Seven Children Trust is the alter ego and/or nominee of George T. and Phyllis Kattar.

10

Children Trust in 1980.  Finally, the government seeks such other relief as might be just, including, in particular, a determination that the trustees of the Seven Children Trust are personally liable for any diminution in the value of Trust assets after the government notified them of its contentions.

I    Assessment and Notice

The defendants assert that summary judgment should be denied because the government has failed to offer proof that the tax assessments have been properly or timely filed, or that requisite statutory notice has been given to the taxpayers.  They do not offer any evidence that the government did not provide the requisite notice, failed to make the required assessments, or that the assessments were inaccurate or invalid.[5]  Neither has the government addressed these issues.

> 26 U.S.C.A. § 6501(a) (West 1999) provides:
>
> Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) . . . and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

26 U.S.C.A. § 6501(c)(1) (West 1999) provides that in "the case of a false or fraudulent return with the intent to evade tax, the

_____

[5]As a preliminary issue, the court notes that "[i]t is settled law that taxpayers bear the burden of proving that a tax deficiency assessment is erroneous."  Delany v. Commissioner of Internal Revenue, 99 F.3d 20, 23 (1st Cir. 1996).  In this case the Kattars have not submitted any evidence challenging the accuracy of the tax assessments, nor do they dispute the merits of the assessments.

tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time." Pursuant to 26 U.S.C.A. § 6501(c)(4), taxpayers and the government can agree to an extension of time in which tax assessments can be made and notice given.

Section 6203 provides that assessment "shall be made by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary. . . ." 26 U.S.C.A. § 6203 (West 1999).[6] Pursuant to section 6303, the government must then "within 60 days, after the making of an assessment of a tax pursuant to section 6203, give notice to each person liable for the unpaid tax . . . ." 26 U.S.C.A. § 6303 (West 1999).

Courts have held that IRS "Form 4340 is probative evidence in and of itself and, 'in the absence of contrary evidence, [is] sufficient to establish that notices and assessments were properly made.'" Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993) (quoting Hughes v. United States, 953 F.2d 531, 540 (9th Cir. 1992)); see also, Pursifill v. United States, 849 F. Supp. 597 (S.D. Ohio 1993); Bassett v. United States, 782 F.

_____

[6]The applicable regulation provides that "[t]he assessment shall be made by an assessment officer signing the summary record of assessment. The summary record . . . . shall provide identification of the taxpayer, the character of the liability assessed, the taxable period, if applicable, and the amount of the assessment . . . . The date of the assessment is the date the summary record is signed by an assessment officer." 26 C.F.R. § 301.6203-1 (1999). The summary record is known as Form 23C. See Brewer v. United States, 764 F. Supp. 309, 315 n.3 (S.D.N.Y. 1991).

Supp. 113 (M.D. Ga. 1992). Cf. Blackston v. United States, 778 F. Supp. 244 (D. Md. 1991) (4340 inadequate where government unable to explain irregularities in computer generated form). Under First Circuit jurisprudence "Certificates of Assessments and Payments are routinely used to prove that tax assessment has in fact been made . . . [and] are presumptive proof of a valid assessment." Geiselman v. United States, 961 F.2d 1, 6 (1st Cir. 1992) (citations and quotations omitted). Moreover, the "Certificates of Assessments and Payments, which list[] 'First Notice' dates for each assessment, also constitute[] presumptive proof that the IRS gave notice of the assessments and made demands for payment" from the taxpayers. Id. Computer transcriptions of IRS records showing that taxpayers were sent notices of assessments and demands have also been accepted as evidence of compliance with section 6303 notice requirements. See, e.g., Schmidt v. United States, 717 F. Supp. 763, 764-65 (D. Kan. 1989) ("It has been held that the computerized transcriptions are sufficient evidence to establish a prima facie case that notice of assessment and demand for payment was sent to the taxpayer.") (citing In re Saunders, 26 A.F.T.R. 2d 70-5388, 70-5389 (N.D. Cal. 1970)).[7] Moreover, as the court in Schmidt recognized, the government enjoys the presumption of procedural regularity. Id. at 765.

---

[7]The court notes the computer transcripts in Schmidt were also accompanied by the affidavits of IRS officials concerning IRS procedures and the forms provided. See 717 F. Supp. at 764-65. In this case the government has not provided any affidavit testimony.

A    <u>Timeliness</u>

The record belies the defendants' contention that the government has supplied no evidence reflecting that timely assessments and notices were made. As discussed above, the government seeks to reduce to judgment tax assessments that relate to years 1963, 1964, 1965, 1966, 1967, 1970, and 1971. After a trial the United States Tax Court determined that Phyllis and George T. Kattar fraudulently attempted to conceal their true income for the years 1963, 1964, 1965, 1966, and 1967. <u>See</u> <u>George T. Kattar and Phyllis Kattar v. Commissioner</u>, 48 T.C.M. (CCH) at 638, 641 (filed July 26, 1984). The Tax Court concluded that the exception provided for in 26 U.S.C.A. § 6501(c) to the limitations on assessments and collections was applicable to those years, <u>see</u> <u>id.</u>, the three year period of limitations for years 1963, 1964, 1965, 1966, and 1967 is inapplicable, and the assessments could be made "at any time." 26 U.S.C.A. § 6501(c)(1) (West 1999).

Although the tax court did not explicitly discuss the issue of fraud and the timeliness of the assessment for 1970, the court found in favor of the government for 1970 and sustained the deficiency determination the government made in its notice of deficiency. <u>See</u> <u>id.</u> at 642. The defendants cannot now collaterally attack that judgment. <u>See</u> <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 597-98 (1948). Furthermore, in this action the timeliness issue for the 1970 assessment was addressed earlier in the context of the defendants' motion to dismiss. <u>See</u> <u>United</u>

14

States v. Kattar, Civ. No. 95-221-JD, 1996 WL 784587, at \*3 (D.N.H. Dec. 31, 1996).

Finally, as to the timeliness of the 1971 assessment, the Kattars filed their return for 1971 on April 15, 1972.  The record indicates that on June 6, 1981, the defendants signed an agreement (Form 872-A) with the government providing that any federal income tax due for 1971 may be assessed on or before the ninetieth day after "the Internal Revenue Service mails a notice of deficiency for such period."  United States Memorandum in Opposition to the Defendants' Motion to Dismiss, Ex. 3.  The record contains a Certificate of Assessments and Payments (Form 4340) for 1971 showing that the first notice was issued August 23, 1985, the same day the assessment was made.  Therefore, the government's initial assessment for 1971 was timely.  See Ward v. Commissioner of Internal Revenue, 907 F.2d 517, 522 n.7 (5th Cir. 1990) ("The waiver of a limitations period under Form 872-A does not terminate until after the IRS sends a valid notice of deficiency to the taxpayer.").

B    Assessment, Notice and Demand

Certificates of Assessments and Payments (Form 4340) filed by the government for 1966, 1967, and 1970 indicate that an assessment was made on April 29, 1985, and notice sent to the Kattars on that date.[8]  Plf. Ex. 1 at 4-6.  The government has

---

[8]As in Geiselman, "the government did not provide the district court with an actual Form 23C, but it did submit several Certificates of Assessments and Payments (Form 4340) which listed

15

similarly filed a Form 4340 for 1971 indicating notice, assessment, and "23C" dates as August 23, 1985.  Id. at 7.  As discussed above, these Certificates of Assessments and Payments constitute presumptive proof that a valid assessment has been made, and that notice and demand for payment was given, as to those assessments listed.  See Geiselman, 961 F.2d at 6.

As for the years 1963, 1964, and 1965 the government has filed certified computer transcripts which contain notations indicating that assessments were made on September 26, 1985, and that notice was sent to the Kattars' address on that date.  Plf. Ex. 1 at 1-3.  However, there is no mention of Form 23C or a "23C date," and therefore no certification that the 23C Form was completed and signed by the assessment officer.  See Brewer, 764 F. Supp. at 315 (S.D.N.Y. 1991) (denying summary judgment where there was "no indication in the record before us that the 'Summary Report of Assessments', known as Form 23C, was completed and signed by the assessment officer as required by 26 C.F.R. § 301.6203-1."); cf. Geiselman, 961 F.2d at 6.  Moreover, where the government has successfully relied upon computer transcriptions to establish assessment, notice, and demand for payment, such transcriptions have been accompanied by other evidence, such as affidavit testimony, addressing the significance of the transcripts and regular IRS procedures.  See, e.g., Schmidt, 717 F. Supp. at 764-65.

_____

the '23C date' (the date the assessment officer signed the Form 23C) for the initial assessments."  Geiselman, 961 F.2d at 5-6.

16

The court concludes, therefore, that the government has met its burden of establishing that a timely and proper assessment was made for years 1966, 1967, 1970, and 1971, and that notice and demand for payment was sent to the Kattars.  See, e.g., United States v. Barretto, 708 F. Supp. 577, 579 (S.D.N.Y. 1989) (where assessment placed in evidence and no material issues of fact exist, government entitled to judgment).  However, the government has not met its burden for years 1963, 1964, and 1965, and genuine issues of material fact exist concerning statutorily required assessments, notice, and demand for payments as to those years.

II   Insolvency

The government argues that the 1972 transfer of Clovelly in Meredith, New Hampshire, and the contents therein, by Phyllis Kattar to the Seven Children Trust was fraudulent under New Hampshire Revised Statutes Annotated ("RSA") § 545:4.  RSA § 545:4 provided that

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditor, without regard to his actual intent, if the conveyance is made or the obligation is incurred without fair consideration.

(1974) (repealed 1987, effective January 1, 1988).[9]  As noted earlier, under RSA § 545:4, fraud must be proved by clear and convincing evidence.  See, e.g., Chagnon Lumber Co., 121 N.H. at

---

[9]The government and the Kattars agree that RSA ch. 545 controls the conveyances during the time periods in issue.

17

176; <u>Jenney v. Vining</u>, 120 N.H. at 381; <u>Furniture Mfrs. Sales, Inc. v. Deamer</u>, 680 P.2d 398, 399 (Utah 1984) (Utah Fraudulent Transfer Act).

In support of their contention that Phyllis Kattar was not rendered insolvent by her transfer of Clovelly and its contents, the defendants have submitted the report and affidavit of Philip W. Grow, a certified public accountant at the firm of Nathan Wechsler & Co. Defs.' Ex. B. Based largely upon Phyllis Kattar's interest in the Kattar Realty Trust, which in turn held shares of the Tri-State Development Corporation, Grow concluded that Phyllis Kattar was still solvent after the 1972 transfer of Clovelly and its contents.

The record is ambiguous regarding Phyllis Kattar's ownership of Kattar Realty Trust stock, Kattar Realty Trust's ownership of Tri-State Development Corporation's stock, and the value of Tri-State Development Corporation's stock. The document establishing the Kattar Realty Trust shows that there were initially one thousand shares issued, and a stock certificate indicates that Phyllis Kattar held those one thousand shares as of October 6, 1961. Defs.' Ex. C. The government has identified no evidence that those shares were then transferred to George T. Kattar. The government has argued, however, that George T. Kattar owned the entire interest of Kattar Realty Trust, although the deposition of George T. Kattar that it relies upon does not support the government's assertion. <u>See</u> United States Renewed Mot. For Summ. J. at 6 n.4. Instead, George T. Kattar stated that he did not

18

know if his wife had an interest in the Kattar Realty Trust, and he deduced that because he started Kattar Realty Trust he must have had an interest in it at some time. See George T. Kattar Dep., Vol. II at 160-61. Phyllis Kattar testified as to her belief that George T. Kattar had an interest in Kattar Realty Trust at some time, but that she was unsure if she did. See Phyllis Kattar Dep., Vol. I at 29.

Other evidence also indicates that George T. Kattar may have held an interest in Kattar Realty Trust. Upon establishing the Meredith Clifford Trusts, George T. Kattar purported to transfer one thousand shares of Kattar Realty Trust to the Meredith Clifford Trusts, despite the lack of any evidence that he held any interest in the Kattar Realty Trust. Plf.'s Ex. 9, 10. Indeed, George T. Kattar identified the value of the Kattar Realty Trust shares transferred as "$0.00" in his gift tax returns. Plf.'s Ex. 10. The court, therefore, finds a triable issue concerning whether Phyllis Kattar actually held an interest in the Kattar Realty Trust in 1972, and what that interest was.

Grow based his determination of the value of Kattar Realty Trust, and Phyllis Kattar's interest in it, largely on the shares of Tri-State Development Corporation ("Tri-State"). Defs'. Ex. B at 2. The summary of the stock record book of Tri-State indicates that 286,568 shares were issued to Phyllis Kattar, Trustee of Kattar Realty Trust. Id. at 16. Although the date of the transfer is not listed, the stock certificates are generally issued sequentially and certificate number thirty one,

19

representing the shares issued to Phyllis Kattar, is listed between the years 1967 and 1969. Id. Of greater significance is a notation "Certificate #31, Spoiled - not issued," although the record indicates that the shares were indeed issued. Id. Finally, the basis for Grow's conclusion that the total book value of Tri-State and its subsidiaries was $1,027,742 is unclear. However, he attests that his analysis included review of the financial statements dated February 29, 1972, and February 28, 1973, of Tri-State and its subsidiaries. Id. at 6, 10. Furthermore, he attested to his ultimate conclusion that Phyllis Kattar had assets remaining sufficient to satisfy her debts, including her tax obligations, after the transfer of Clovelly. Id. at 6. This conclusion was dependent upon his review of the financial statements of Tri-State and its subsidiaries. Id. at 2, 5-6. The court therefore concludes that on this record there are genuine issues of material fact regarding the issuance of Tri-State stock to Phyllis Kattar, as trustee of the Kattar Realty Trust, and the value of that stock.[10]

Given the above discussion, the court concludes that the issue of insolvency has not been established by clear and convincing evidence and that triable issues remain concerning whether Phyllis Kattar was rendered insolvent by her transfer of the Clovelly residence in 1972. Summary judgment premised upon RSA § 545:4 is therefore inappropriate.

---

[10]The court also notes the Tax Court's conclusion that George T. Kattar engaged in fraudulent book-keeping practices. See Kattar, 48 T.C.M. at 642.

20

III  Intent to Defraud

The government, relying upon RSA § 545:7 (repealed 1987, effective January 1, 1988), next asserts that summary judgment is warranted because there are no genuine issues of material fact concerning the Kattars' intent to defraud in transferring Clovelly.[11]  RSA § 545:7 provided

> Every conveyance made and every obligation incurred
> with actual intent, as distinguished from intent
> presumed by law, to hinder, delay or defraud either
> present or future creditors is fraudulent as to both
> present and future creditors.

(1974) (repealed 1987, effective January 1, 1988).

In support of its motion, the government argues that the transfer of Clovelly was made for inadequate consideration, was essentially made to an insider, and constituted virtually all of Phyllis Kattar's assets.  Moreover, the government identifies the chronology of events present in this case.  The transfer of the Kattars' assets began almost immediately after George T. Kattar was contacted by the government concerning a criminal investigation for tax evasion.  Clovelly was transferred just two months after George T. Kattar's tax indictment.  Finally, the government points to the Kattars' continued enjoyment of transferred assets for residences and as security for loans, to the Kattars' failure to identify beneficiaries of the Seven Children Trust until 1983, and to the Kattars' leases for Clovelly.  The leases spanned ten years, were retroactive, and

_____

[11]Although the record indicates that Phyllis Kattar was the transferor, the government does not consistently distinguish between Phyllis or George T. Kattar in this regard.

21

were executed shortly after an $800,000 judgment was rendered against George T. Kattar on May 3, 1983. The government argues that the indicia, or badges, of fraud present in this case give rise to a presumption of fraud that shifts the burden to the Kattars to dispel.

The Kattars assert that the transfers of assets identified by the government, including the transfer of Clovelly, were executed as part of the Kattars' estate planning for inheritance tax purposes. George T. Kattar testified that the transfers were done pursuant to the advice of attorneys and accountants for inheritance tax purposes. Mary Abdoo, the sister of George T. Kattar and a trustee of the Seven Children Trust, testified that when she was asked in 1972 to be a trustee, George T. Kattar stated that the Seven Children Trust was created for the benefit of his children and that he wanted her to be the trustee because she would protect the children's welfare. Similarly, George P. Kattar, one of the Seven Children Trust's beneficiaries, testified that he was told by his father, around the time of the Trust's creation, that the Trust was for the benefit of the children and to preserve a residence that would always be theirs.

A plaintiff asserting that a transfer was fraudulent pursuant to RSA § 545:7 "has the burden of proving by clear, convincing and direct evidence the existence of a fraudulent intent." Chagnon Lumber Co. v. Demulder, 121 N.H. 173, 176 (1981); Jenney v. Vining, 120 N.H. 377, 381 (1980) (plaintiff must show by "clear, convincing and direct evidence, the

22

existence of fraud or actual fraudulent intent" in context of RSA ch. 545); cf. Snow v. American Morgan Horse Assoc. Inc., 141 N.H. 467, 468 (1996) ("fraud must be proved by clear and convincing evidence, but such proof may be founded upon circumstantial evidence") (context of fraudulent misrepresentation) (citations and quotations omitted). But see, Krinsky v. Mindick, 100 NH 423, 425 (1957) ("Direct evidence of fraud however is not essential for the issue of fraudulent intent or knowledge can be determined on the facts and circumstances of the particular situation."); Curran v. Salvucci, 426 F.2d 920, 922 (1st Cir. 1970) (direct evidence not necessary). "Fraud is never to be presumed, but must be established by clear and convincing proof." Hoyt, 105 N.H. at 390. "Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind." Golden Budha Corp. v. Canadian Land Co., 931 F.2d 196, 201-02 (2d Cir. 1991); see also, Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1265 (5th Cir. 1991) ("we have emphasized repeatedly that cases which turn on the moving party's state of mind are not well-suited for summary judgment."); Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 283 (9th Cir. 1980); Jackson v. Star Sprinkler Corp., 575 F.2d 1223, 1231 (8th Cir. 1978) ("Ordinarily, fraudulent intent is a question to be determined by a jury or by the court as fact-finder and not on a motion for summary judgment."). As the Fifth Circuit explained, this is because "[w]hen state of mind is an essential element of the

23

nonmoving party's claim, . . . [the] party's state of mind is inherently a question of fact which turns on credibility." Int'l Shortstop, 939 F.2d at 1265. "Credibility determinations, of course, are within the province of the fact-finder." Id.

Issues of credibility are squarely before the court in this summary judgment motion. The Kattars' testimony concerning motivations and intent are corroborated by the testimony of Mary Abdoo and George P. Kattar about statements made contemporaneously with the creation of the Seven Children Trust. As discussed above, triable issues exist about the financial condition of Phyllis Kattar at the time of the Clovelly transfer. Furthermore, lawful justifications can be offered to explain a number of the indicia of fraud relied upon by the government. If, indeed, the Kattars sought to transfer the assets as part of their estate planning, the "insider" recipients of the transfers, the consideration given in exchange for the transfers, and the Kattars' continued enjoyment of the assets may possibly, given all reasonable inferences, be understood to be motivated by something other than an intent to defraud creditors. However, other factual issues, such as the chronology of events, cannot be so readily interpreted as motivated by lawful interests. In short, the court concludes that on this record and in the context of summary judgment, where all reasonable inferences are drawn in favor of the non-movants and credibility issues abound, granting summary judgment as to Phyllis Kattar's allegedly fraudulent intent would be inappropriate.

24

IV    Trust Amendment

The government argues in the alternative that the transfer of Clovelly did not occur until 1983 because of the failure of the Seven Children Trust to adequately identify its beneficiaries.  Therefore, it argues, the 1983 transfer was fraudulent pursuant to RSA §§ 545:4 and 545:7.

Under Massachusetts law, "[w]hether a trust is created depends primarily upon the manifestation by the [settlor] of an intention to create a trust."  Ventura v. Ventura, 407 Mass. 724, 726 (1990) (quoting Russell v. Meyers, 316 Mass. 669, 672 (1944)).  "In order for a trust to be valid in the Commonwealth, it must unequivocally show an intention that the legal estate be vested in one person to be held in some manner or for some purpose on behalf of another."  Id. (citations and quotations omitted) (holding trust valid where it specified the trust's res, duration, beneficiaries, and the trustees' powers and duties). The beneficiary must be "a person who is to have a right to enforce the trust."  Restatement (Second) of Trusts § 112 cmt. a (1959); McLemore v. McLemore, 675 So.2d 202, 204 (Fla. 1st Dit. Ct. App. 1996) (quoting Kunce v. Robinson, 469 So.2d 874, 877 (Fla. 3d Dist. Ct. App. 1985)); Fitzsimmons v. Harmon, 108 Me. 456 (1911).

"Members of a definite class of persons can be the beneficiaries of a trust," Restatement (Second) of Trusts § 120 (1959), if "the identity of all the individuals comprising its membership is ascertainable," id., cmt. a.  Under Massachusetts

25

law, where the trust does not establish a definite, limited class of beneficiaries such that the beneficiaries are ascertainable and capable of enforcing the trust, the trust fails. See Old Colony Trust Co. v. Wardell, 293 Mass. 310, 313 (1936). Therefore, in circumstances where a trust provided for the issuance of shares to beneficiaries but no shares are ever issued, no trust is formed. See Kaufman v. Federal Nat'l Bank, 287 Mass. 97, 98 (1934) ("No shares were ever issued, and no cestui que trust over [sic] existed."). As the Massachusetts Supreme Court has stated

> As [the settlor] never designated a beneficiary as required by the declaration of trust, the [trust] never came into existence and the attempted conveyance fails for lack of a cognizable recipient.

Arlington Trust Co. v. Caimi, 414 Mass. 839, 848 (1993). Although the Kattars argue that the trust document evinces a clear intent to create a trust, under Massachusetts law such an intent must be sufficiently manifested to give rise to a valid trust. See infra.

Again, the government's argument in the alternative relies upon RSA §§ 545:4 and 545:7, and turns upon either Phyllis Kattar's insolvency or her fraudulent intent in 1983. The court finds that on this record triable issues exist as to Phyllis Kattar's solvency in 1983. As previously noted, the issue of her ownership of Kattar Realty Trust stock cannot be resolved on the record before the court. The IRS document filed by the Kattars setting forth their net worth, as submitted to the court, lacks a date next to their signatures. See App. to United States Mot.

26

for Summ. J., Ex. 29 at 2. However, it identifies 1984 as the last year for which the Kattars filed an income tax return, which would indicate that the form presumably represented the Kattars' assets sometime after April 1985. Finally, the declaration of Marc Payeur, signed in 1996, states that after his assignment to the Kattars' account in 1988 he did not find any material assets owned by Phyllis Kattar. However, this does not bear on the status of her assets in 1983.

The court concludes that the government has not established the lack of a genuine issue of material fact regarding the solvency of Phyllis Kattar in 1983, and therefore on this record the court cannot conclude that a conveyance in 1983 would be fraudulent under RSA § 545:4. Moreover, given the considerations discussed more fully in the context of the purported 1972 transfer, summary judgment as to Phyllis Kattar's fraudulent intent in 1983 is inappropriate on this record.[12]

V    Nominee and Alter Ego

The government also argues in the alternative that the Seven Children Trust can be considered the nominee of George T. and/or Phyllis Kattar. State law controls the determination of whether an entity or individual is the nominee of another and liable for the other's tax debts. See Sequoia Property and Equip. Ltd. Partnership v. United States, No. CV-F 97-5044 OWW SMS, 1998 WL

_____

[12]The above-discussed considerations likewise preclude granting summary judgment on the government's claims concerning the transfer of personal property in 1980 or 1981.

471643 at *3 (E.D. Ca. May 13, 1998). Although none of the parties have identified the controlling state law on the issue, both the government and the defendants agree that the issue is governed by the following factors:

A) No consideration or inadequate consideration is paid by the nominee;

B) Property is placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;

C) A close relationship between the transferor and the nominee exists;

D) Conveyances were not recorded;

E) The transferor retained possession of the property; and

F) The transferor continued to enjoy the benefits of the transferred property.

See United States' Renewed Mot. For Summ J. at 45 (citing LiButti v. United States, 107 F.3d 110 (2d. Cir. 1997)); Defs'. Obj. to United States Renewed Mot. For Summ. J. at 16 (citing Sequoia Property, 1998 WL 471643 at *3)).

Despite the government's considerable evidence, when all reasonable inferences are drawn in the favor of the non-movants the court finds that there is a genuine issue of material fact as to the alleged nominee status of the Seven Children Trust. Some indicia, such as the consideration given in exchange for the assets and the close relations between the beneficiaries, the trustees, and the transferors, may be interpreted in a light favorable to the Kattars given evidence that the Trust was intended as an estate planning device. Also, it appears that

28

deeds exist for many of the conveyances. Other indicia exist, however, such as the timing of the transfers, which suggest a nominee status.

Moreover, credibility issues are implicated when considering whether George T. and Phyllis Kattar retain control, possession, and continued enjoyment of the premises. For example, George T. Kattar has testified that he and his wife reside in the Methuen premises by the largess of the beneficiaries and subject to their indulgence. Not only do George T. and Phyllis Kattar live in the Methuen residence, but so do George P. Kattar and his family. Various other Kattars have moved in and out at different times. The record indicates that the Kattars' children do not pay rent when they live there. Similarly, evidence exists that many of the Kattars enjoy Clovelly. Furthermore, evidence exists that Trust assets were not only used to benefit George T. and Phyllis Kattar, but the beneficiaries as well. Among other things, money was transferred not only to George T. and Phyllis Kattar and their enterprises, but to enterprises associated with George P., Kevin, and apparently James Kattar as well.

Although initially George T. and Phyllis Kattar and Mary Abdoo were the trustees of the Seven Children Trust, the record indicates that George T. Kattar resigned his position as trustee in 1984, and that George P. and Kevin Kattar are now trustees of the Trust.[13] The record also contains some evidence that Kevin

---

[13]The record indicates, however, that George T. Kattar remains a signatory on the Trust bank account.

Kattar has assumed substantial control over the Trust assets, including its checking account, and that he has been liquidating Trust assets such as artwork and jewelry in his capacity as trustee to pay bills of the Trust, which include maintenance of the Trust properties. The court concludes that the record contains significant conflicting evidence regarding control of the Trust.

As an alternative to nominee status, the government argues that the Seven Children Trust is the alter ego of George T. and/or Phyllis Kattar. Many courts have determined that state law controls the issue of alter ego in tax collection cases. See, e.g., Wolfe v. United States, 806 F.2d 1410, 1411 (9th Cir. 1986) ("State law governs the determination of whether there exists an alter ego from whom the government may satisfy the obligation of a taxpayer.") (citing Aquilino v. United States, 363 U.S. 509, 512-23 (1960)); Dean v. United States, 987 F. Supp. 1160, 1164 (W.D. Mo. 1997); Sequoia Property, 1998 WL 471643 at *3. However, courts have also referred to federal law and have found the distinctions inconsequential. See Dean, 987 F. Supp. 1164 (citing cases). In either case, when courts have considered the alter ego issue in the context of trusts, they have relied upon law governing the disregard of the corporate form. See, e.g., id. at 1164-65; William L. Comer Family Equity Trust v. United States, 732 F. Supp. 755, 759 (E.D. Mi. 1990); Loving Saviour Church, 556 F. Supp. at 691-92; see also, Village Press Inc. v. Stephan Edward Co., 120 N.H. 469 (1980). The parties do

30

not address the issue of the governing law, although the government relies upon federal law and the Kattars upon New Hampshire law.[14]  Both parties analogize to and rely upon the doctrine of piercing the corporate veil.

Under either Massachusetts or New Hampshire law, a court may pierce the corporate veil to prevent an injustice or fraud on the plaintiff.  See Terren v. Butler, 134 N.H. 635, 639 (1991); Village Press, Inc., 120 N.H. at 471 ("plaintiff must establish that the corporate entity was used to promote an injustice or fraud"); My Baking Bread Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620 (1968) ("in rare particular situations in order to prevent gross inequity"); New England Theatres, Inc. v. Olympia Theatres, Inc., 287 Mass. 485, 493 (1934) ("It is only where the corporation is a sham, or is used to perpetrate deception to defeat a public policy, that it can be disregarded.").  "The burden rests upon the party who seeks to pierce the corporate veil to establish by uncontroverted facts (for purposes of summary judgment) the activities of the individual which demonstrate a virtual disregard of the existence of the corporate entity behind which he seeks to hide."  Sherman Williams Co. v. H & R Painting Co., No. 9128, 1992 WL 14090, *2 (Mass. App. Div. Jan. 16, 1992).

Under Massachusetts law, a corporate form may be disregarded

---

[14]No mention is made of Massachusetts law in this regard. The court need not resolve the issue of whether Massachusetts or New Hampshire law controls as it concludes that summary judgment is unwarranted under either of the standards.

where:

> (1) "there is active and pervasive control of [] business entities by the same controlling persons and there [are] fraudulent or injurious consequences by reason of the relationship . . . ;" or (2) "there is a []confused intermingling of activity . . . [and] a common enterprise with substantial disregard of the separate nature of the [corporation], or serious ambiguity about the manner and capacity in which [] corporations and their representatives are acting."

Balcor Company v. Daejen (Massachusetts) Inc., No. 915835E, 1994 WL 879679, *5 (Mass. Super. Ct. Mar. 30, 1994)) (citations and quotations omitted) (disregarding distinctions between corporate entities); see also, My Bread Baking Co., 353 Mass. at 619. Similarly, the New Hampshire Supreme Court has considered such factors as whether "a shareholder suppresses the fact of incorporation, misleads his creditors as to the corporate assets, or otherwise uses the corporate entity to promote injustice or fraud," see Druding v. Allen, 122 N.H. 823, 827 (1982), whether formalities were adhered to, see id., and "whether the stockholder [was] using the corporation to further his own private business rather than that of the corporation," see Village Press, 120 N.H. at 471.

While the record clearly contains evidence supportive of the government's position that the Seven Children Trust was the alter ego of George T. and Phyllis Kattar, the record also contains sufficient countervailing evidence to preclude summary judgment against the defendants, as discussed more fully above in the sections concerning fraudulent intent and nominee status.

32

<u>Conclusion</u>

In light of the above discussion, the court concludes that the government is entitled to judgment as to its assessments and corresponding statutory additions for years 1966, 1967, 1970, and 1971. However, the court otherwise denies the government's motion and concludes that summary judgment on this record would be inappropriate. Given the court's conclusion in this regard, at this time the government's request for litigation expenses is denied, as is its request for a determination that the trustees are personally liable for any diminution of value of Trust assets (document no. 90).

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

August 19, 1999

cc:  George P. Eliopoulos, Esquire
     Albert F. Cullen, Jr., Esquire
     Steven M. Gordon, Esquire
     Janice E. McLaughlin, Esquire
     Philip T. McLaughlin, Esquire